Our next case is Carpenters Pension Fund of Illinois v. MidMedx Group, Inc. Just a moment for the scenery to change here before we get started. All right, we'll hear from Mr. Wylens first. Good morning. May it please the Court, my name is Doug Wylens and I represent the plaintiff in the securities fraud action against MidMedx and its top executives in a massive accounting fraud case that involves years of restated financial results, terminations for cause, an SEC settlement, and ultimately criminal convictions. Now, despite that record of fraud and the more than 20 events gradually disclosing that fraud to investors during the class period, the District Court dismissed the case on loss causation grounds. We submit that the District Court's analysis was an error, contravened relevant precedent, and should be reversed. Now, in my limited time here today, I want to talk specifically about one, what we call partial disclosure, and that's the disclosure from February 20, 2018. Now, on February 20, 2018, I'll explain why that disclosure sufficiently alleges loss causation under this Court's decision in Meyer v. Green and more so in the— I guess anything, anything that happened before you owned stock and anything after you owned, your client owned stock have no bearing on the question of loss causation. No, I don't agree with that. I agree for determining whether our client suffered a loss were not, then, anything, disclosures that occurred after our client sold out his shares did not cause the loss. But our argument is more— Nor give you standing, correct? Yes, nor give a standing, but what we're saying here is that when you look at loss causation, you need to look at the entire spectrum of events that happened in the case. But you sold, your client sold the stock on February 26 of 2018 before the misrepresentations came out, correct? Well, yeah, we sold— There's no dispute that we sold our entire holdings on February 26, 2018. But what we're saying is you look at the entire—the date upon which we sold our shares has no bearing on whether or not there's a corrective disclosure made before that or after that. It's similar to what I would direct you to is when you determine—it's an objective determination based on events that provide context for those disclosures when they're made. So it's similar to like a falsity type analysis where we say the company made a false statement. Whether an investor bought or sold stock has no bearing on the objective analysis of whether that statement is false. The same type of analysis is true here. Whether or not any specific corrective or partial disclosure is in fact a partial disclosure has no bearing on when our client sold stock. Now, what we say here is you need to look at—and what the precedents show is that when there is a series of partial disclosures gradually disclosing a fraud over a period of time, you look at the entirety of the class period. And then you make a determination, did those—under a cumulative analysis, were certain events that occurred prior to the end of the class period partial disclosures of the truth? And what we're saying here to answer your question is, at least with respect to the February 20th, we allege that there are many more before that. But the February 20th, 2018 disclosure, which preceded our class period sales, is a corrective disclosure and we suffered a loss when we sold six days later. And how we get to that, specifically in Meyer v. Green, is that you look at what Meyer v. Green—first let me step back and say on February 20th, the company disclosed two things. It said, we can't release our financial results for the fourth quarter of 2017 in the full year. And the second thing is they linked that to a disclosure that the Audit Committee was commencing its third investigation into accounting proprieties relating to those financial results. Our client sold six days later. So that's the disclosure we're talking about here, among the many others, but that's the one I'm, in my limited time, I'm discussing with you today. So what happens is, under Meyer v. Green, what Meyer says is an SEC announcement alone is insufficient to establish false allegations. No problem with that holding. But what it goes on to say is it's an SEC investigation without more. Now, in that Meyer v. Green, the court didn't define what the more is, but they further explain that more could encompass situations where there's a later finding of actual wrongdoing. But if that later finding occurs after you've sold your stock, whatever the more impacts the stock price has no bearing on you. Well, but it has a bearing on whether the February 20, 2018 disclosure is a corrective disclosure. So we're, I'm not, we're not claiming any loss for those later events. What we're saying is when you cumulatively look at the spectrum of events, starting with the disclosure of the, of the announcement of the Audit Committee investigation and inquiry and the announcement of postponed, then you look on June 6, they then announce six months later, we're restating six years of financial statements. And then a month later, the CEO and CFO, the two, the CFO and the other top executive leave, are terminated for cause. You look at the entirety of that and you have the more that says we can establish loss causation when you look at the cumulative amount of events. My confusion still is how does that, something that happened after you sold the stock, how do you have standing to complain about that? You own stock, they made an announcement, which the case law seems to say is not enough. You sold the stock and then it turns out that that announcement had some more significance. But you, you're long since out of it, and so whatever market impact resulting from the more, you're not. There's no requirement in Meyer v. Green that we have to hold throughout the end of the class break. There are numerous cases that we provided. The determination that you're asking is only relevant to whether we actually suffered a loss and had standing. But we had standing, one, from the outset of this case when we filed it because we could show that we suffered a loss. And then we suffered a loss as a result of the February 20th disclosure. What is the statute of limitations on an action like this? I believe it's three years. So the rule you're proposing then would mean that the exact same cause of action would have force as long as the investigation came out within three years. But it wouldn't have force if it came out within more than three years, right? Not necessarily, no, because, I mean, we're saying you could look at events that are post-class period that still inform. I mean, we have an event here where, in June of 2019, we say defendants admitted that the February 20th disclosure was a partial disclosure when they were dealing with Mr. Pettit coming back and trying to— So your point is you'd always want to file the lawsuit and just hope that the announcement validating your position came out at some point later. Because if you didn't file the lawsuit within the three years, then if the announcement came out later, you would be out of luck, right? Well, I would say Meijer-Green sort of puts us in this box where instead of— I agree. I'm not sure. Maybe Meijer is wrong. I think there could be a statute of limitations problem, but we can only go with what are disclosures in this case. The case was filed at an appropriate time. We had standing when we filed the complaint. We can only look at the spectrum of events that happened in our class period. I fully understand your frustration. I'm just trying to figure out, you know, from a logical standpoint, what you're asking us to hold and what its implications would be and whether that creates additional problems. Do you understand where I'm coming from on this? Yes. Well, I guess I would turn to my alternative argument, which is we say regardless of the cumulative aspect, under the proximate causation principles established in Dura and its progeny, that the February 20th disclosure is good enough by itself. Then what do we do with Meijer in that case? Well, I think what I'm saying is Meijer involved only the announcement of an SEC investigation. What we have here are not Meijer events, in our view, in that they involve the postponement of financial statements. That is usually a telltale sign because what a reasonable investor takes from that is that— There's a problem of some type, or else you wouldn't— No, I'm sorry. The auditor is not signing off on those financial results to the extent that they can be released to the public. So you have that event, and then in this particular case, the audit committee investigation was the third investigation. So it's not just the same ball of wax that we were dealing with in Meijer. So it's our view that looking at what Dura says about the truth leaking out and the truth becoming known to investors, we say that is a relevation in and of itself with respect to the pleading of loss causation. With the limited time I have left, I just want to make a reference that— this whole loss causation thicket. We did offer to—we did move to file an amended complaint that added a plaintiff that cured all of the problems that the district court had, which was— We had a client who held throughout the end of the class period. So there's no perceived standing issue and no perceived loss causation problem. So it's our view— But that request to amend didn't—I mean, the district court found that request to amend came much too late, did it not? The district court made no finding. It just said you don't satisfy Rule 59 and Rule 60. It didn't give us any indication why that occurred. You know, there was a suggestion in the footnote, well, could you have done this earlier? We're under no compulsion to take what the defendant's arguments are as truthful and correct. So your position on that, and let me know if you disagree, as I understand it, is the district court had to at least explain why it wasn't allowing the amendment. Yes. The district court could decide within its discretion without abusing it, provided it gave a good enough reason, that it wouldn't allow you to amend. But it had to say why it wasn't doing so. Well, I think, yes, under Fohman v. Davis, there are certain factors that are laid out that would give us— The short answer to your question is yes. The longer answer is I think we don't have a problem here because there are no—of those Fohman grounds that would suggest that we couldn't bring an amendment. But the district court also didn't, on its own, have to give you leave to amend, did it? No, but we're not suggesting. I know defendants say that, well, we're asking for some sua sponte grant of leave to amend. All we're saying is we should be able to file our motion for amended—motion for leave to file a complaint. Let the parties brief it. We think we are in the right here and that our client could—our amalgamated bank could come in as an additional plaintiff and cure whatever problems and protect the live class claims that were still pending in the case. Thank you. All right. You've reserved three minutes. I believe we'll hear next from Mr. Moran. Is that right? Good morning, Your Honors. Joan Moran from McGuire Woods on behalf of Cherry Becker, the outside auditor of MiMedx until mid-2017. Although we've raised several grounds for affirmance in the briefing, we agree with Judge Ray and the company's counsel, from whom we'll hear in a minute, that the plaintiff pension fund failed to establish loss causation and that that failure is particularly acute as to Cherry Becker, the outside auditor, and plaintiff's counsel has not argued to the contrary this morning. We are confident that if the court looks at the alleged misstatements and the alleged corrective disclosures with an eye to Cherry Becker, again, as the outside auditor, that it will agree that there's—as this court did in Grophy, where it broke out the auditor and looked at the allegations there separately, that it will agree and that it will affirm. And under the Supreme Court's decision in Dura, the plaintiffs—you have to look at two things when you're assessing loss causation. One, what is the alleged misstatement? And two, when and whether the market cleared that misstatement out and had it sort of taken out of the market price, because the decision of the Ninth Circuit that the Supreme Court was reviewing in Dura was the suggestion that the mere inflation of the price at time A was enough to establish loss causation. The court said no. You have to—it both has to be there at the beginning when you purchase the stock, and it has to be gone by the time that you sell the stock. Now, what this court said in Meyer is that the announcement of an investigation and the market's reaction to that based on the perception of risk, that there might be some wrongdoing that comes out later, does not meet the Dura standard, that it's not enough even to show that the price dropped 40 percent or some other amount, because that's the market reacting to the risk, not to the actual disclosure of the fraud. And I think what plaintiffs want to say is that they can show a partial disclosure by showing that they were partway to the fraud being disclosed, as opposed to what a partial disclosure really looks like, which is, you know, part of the fraud has come to light, but other parts of the fraud might not have come to light. And this is a case where the underlying alleged scheme at issue involved multiple distributor streams. So you can imagine a situation where one of those gets revealed, but the others are not yet revealed, and then later the rest of them are revealed, and so you have a series of partial disclosures. But, I mean, it does seem problematic, right? There are investigations announced, sort of a drip, drip, drip of bad news coming out here. And, you know, including the accounting stuff. And there's no cause of action, under your theory, until such time as there's an actual finding that is entered. Well, it doesn't have to be a formal finding, but it has to be more than the announcement of the investigation. I think, as to our client, Sherry Beckert, in particular, there are two things I know I've limited time that I'd like to emphasize. One is, you have to connect the alleged corrective disclosure not just to the alleged disclosure of the fraud, but to the alleged correction of the misstatement by the auditor. And under the Supreme Court's opinion in Omnicare, which essentially creates a wall around the auditor's audit opinion and says it's incredibly difficult to plead a securities fraud claim based on that auditing opinion, you've got to find something else that's the alleged misstatement by the auditor, and then you have to connect to allege that that was disclosed to the market and corrected. And I think, by definition, the disclosure of delaying the financials to take a closer look at them cannot be a revelation to the market that the auditor has so failed to exercise their auditing function that they get outside of the scope of Omnicare. Quite the opposite. It shows that the auditor, and frankly Sherry Beckert had been replaced by that point, that the auditor is looking closely at the issue. Thank you, counsel. Thank you. Mr. Blackwell. Good morning. May it please the Court. My name is Keith Blackwell, and I represent my medics in this case. Judge Wray, sitting for the district court, correctly and properly dismissed the second amended complaint in this case based on the correct conclusion that this particular plaintiff, the Carpenters Pension Fund, had failed to adequately plead loss causation. And Judge Wray thereafter did not abuse the district court's considerable discretion when the court denied the post-final judgment motion to amend the complaint by substituting a new plaintiff. One of the disclosures, it seemed to me the district court, rather than going day by day or disclosure by disclosure, put them in different buckets and dealt with them collectively. And one of the buckets that the district court created was news releases and analyst reports. And one in particular caught my attention. It's on page 10 of the district court's order where he's talking about the Aurelius value report. And the docket sites he gives have a quote that says, the report is based on information reasonably available to the auditor. But then the district court goes on to cite some disclosures on the website. And I'm wondering, are those two things consistent? On one hand, something reasonably available to the author could mean public sources and independent research. But the district court seems to discount that latter possibility by citing to the website. So he'll speak to us about that a little bit. Was that proper for the district court to do, and does it make a difference? I don't think it makes a difference. I mean, first, Your Honor, I don't think they're inconsistent in any way. I mean, reasonably available to those preparing the report certainly would include publicly available documents. There's no inherent inconsistency there. It's also possible, certainly, that reasonably available could include reasonably available from other sources. But it doesn't drive necessarily towards that conclusion. And so I think you read the disclaimer that Aurelius has out there alongside and consistent with the statement in the report. And how did the district court come to that website? Was that cited to him by the parties, or did he go out and find that on his own? I believe it was cited by the parties, Your Honor. I have a question. I'd like to direct your attention to the Meyer footnote. Yes. And so my understanding of that is that the reason that we don't count as a disclosure, an investigation, is because it might be the market reacting to the news of the investigation. That is, that there might in the future be some bad news. Would you agree with that? I would. I think the announcement of any investigation, whether it's an investigation by the securities regulators, by the Justice Department, State Attorney General, or even an internal investigation as we had in this case, the announcement of an investigation creates some uncertainty. Okay. Well, that being the case, the Meyer footnote also says without more. And so if, for example, there were later a report by the SEC or an issuance of fines or whatever the case may be, showing that, in fact, the reason that it was conducting the investigation, all of the allegations proved to be true, that there were some material omissions or material misrepresentations in the disclosures, then would you agree also that Meyer suggests that you would then be able to recover, at least in the situation where that happened before you sold? Your Honor, I don't think Meyer suggests that this Court would, in fact, endorse that approach. I think the footnote 13 in the Meyer decision pretty explicitly leaves that question open for determination at a later point in time in a case where that sort of theory might matter. And I would suggest that in pertinent part, this case is actually like Meyer, and it's therefore not the right case to decide whether that sort of announcement of an investigation coupled with a later determination of falsity and fraud would somehow render. Maybe that's right. But my question, I want to sort of parse through the reasoning and the logic of Meyer. If part of the reason why the stock goes down or the market is reacting to the news of an investigation is because of the potential for future loss, because this could be bad, right? And if we were to decide or a future panel were to decide, because this isn't the right case, that Meyer means that if you sell after the news comes out that substantiates the worst-case scenario or a bad-case scenario on the investigation in the first place, then isn't some of the market loss already realized before the bad news comes out? In other words, yes, it's the market reacting when there's news of the investigation, but it's reacting because it's expecting that there could be future bad news. And if there is the future bad news that it's expecting to come out, then the market is reacting by selling off shares to reflect what the value of the stock may be if the bad news is realized. And so that when the bad news comes out later and is confirmed, why isn't there already a partial realization of the loss after the investigation turns bad? I mean, after the investigation is announced. Do you know what I mean? Yes. I think, Your Honor, it's because, in part, it's very difficult to know the mind of the market when you don't have an announcement of what's going to happen. I agree. Maybe it's a proof problem. Maybe that's the problem. I don't know. But it just seems counterintuitive to me to suggest that there's no loss at all, no cognizable loss at all unless and until the bad news is actually confirmed when you have a government regulator that's conducting and making announcements of investigations. Now, I understand, obviously, innocent until proven guilty. This is not actually a criminal situation, but the same kind of principle. And so we want to be careful about tagging a company just because it's under investigation. But I wonder whether if later it turns out that it's true, if there's validation of those allegations, why isn't it fair to attribute some of the loss to the investors who sell off after the news of the investigation, right, instead of waiting to ride the train all the way down into, you know, maybe into worse territory? Why isn't it fair to attribute it to them? Well, I think, Your Honor, that in a circumstance like that where you have holders of the security who there's an announcement of investigation and then they get out, I mean, you run into the Dura problem, Your Honor, which is at that point in time, there either has been a market adjustment based on a disclosure of falsity or there has not. And when they've gotten out before there's any actual determination by a government regulator or admission by the company itself or even a third party directly establishing the falsity of their prior representations, all you have are losses that are reactions to uncertainty. I mean, I think maybe the better argument is, well, then everybody would just go out after an investigation is announced and basically you would allow there to be effectively an insurance for bad invest—I mean, because ultimately if it turns out that things go well, then the person couldn't recover. Like if the investigation doesn't yield fruit, then the investor who got out before the results came out maybe took the gamble, well, if things don't go our way, we can always sue later. Or if the investigation results are confirmed, we could always sue later. And if they're not confirmed, well, I guess we're just going to eat it now. We'll eat the loss for now. I mean, is that the best argument there is for this? Well, I think that's exactly right. I think that is a very compelling argument against that sort of rule because in Dura, the Supreme Court made very clear that whatever rules are devised in the decisional law for loss causation, they have to reflect this idea that the securities laws are not meant to provide just downside insurance for investors who make the wrong choice in face of uncertainty or risk. And they also have to address the reality that when you have a lawsuit filed under the Securities Act or the Exchange Act, I mean, it really does have an interim effect on defendants. And so the rules have to be calibrated in a way that it doesn't subject companies to endless lawsuits whenever there's an announcement of an investigation or other bad news that emerges that does not, in fact, disclose the falsity of any prior representation, that they're going to be subjected to endless lawsuits that will sit pending until there is some resolution of the investigation, which, by the way, sometimes here the internal investigation at least was resolved within a few months and a determination was made by the company and the audit committee that financials were going to have to be restated. But it is not uncommon at all, I would suggest to the Court, for regulatory investigations sometimes to span many months or sometimes several years before you get a resolution. And in the meantime, you would have companies subjected to the interim effect of those pending lawsuits that were filed as soon as the investigation was announced. Thank you, counsel. Thank you. All right. Mr. Williams, you have three minutes. Thank you. This is the different case that is discussed in Meyer in that footnote where you have a disclosure of an investigation in addition to the postponement of financial results and then you have the subsequent actual findings of wrongdoing. And then all we're suggesting is that when you look at that, and this goes to the broader error that we assign to the district court's analysis as a whole, you look at it cumulatively. Like you would in any case, from start to finish, you look at the facts and recognize that we're under a 12B6 motion here so that these are not issues of proof that the court has to deal with. It's just that did we allege enough. And what Meyer was concerned about is, well, we shouldn't give investors a windfall when there are speculative issues. There's no speculation here. The company admitted that, one, they needed to restate, but as you look at the sequence of events that occurred afterwards, there was a fraud here. So our clients' losses did not stem from some market forces beyond their control. It's directly related to the fraud in that you have the announcement of an investigation, restated financials, and then ultimately a continuing cascade of bad news. So when you look at all of that under Meyer and under Dura, the proximate causation leakage theory that was discussed in Dura, we've pled enough, and we have to be very careful, as Judge Martin pointed out in her concurring opinion in the Sapsov case, that you can't conflate falsity in SIENTA with the loss causation analysis. It's just did the disclosure share the same subject matter as the fraud? Was there a stock drop? And then there's a determination of is there new news? And for defining what a corrective disclosure is, the February 20th satisfies all that criteria. And what an opposite result would result, you'd be punishing investors who mitigate their losses, who draw a reasonable conclusion and a plausible conclusion at the pleading stage that there's something wrong here, and we're going to mitigate our losses. So what you're suggesting then is only a plaintiff who held to the very bitter end can even— There are no assets left to get in a lawsuit. That's a different issue, but you couldn't even recover damages until the hammer finally drops here. And what we're suggesting, and every circuit court says you can have a series of partial disclosures. They're partial disclosures because they're not fully revelatory. It comes out in drips and drabs. Is there a difference between standing and the loss causation element you're required to allege? Yes. What is the difference? I guess I'm missing that. This Court has said in the focus on the family case that you cannot use proximate causation to establish standing. So when the district court said, well, you failed to establish loss causation and, ergo, you also have standing, that's incorrect. It's conflating the two issues. Standing is a much more lenient standard, and we have— You don't have to prove causation at the pleading stage to have standing. You have to prove causation ultimately to show loss causation to recover, but you don't have to prove it at the pleading stage. All you have to do is show that you suffered a loss at the hands of that defendant. And it could be redressable by some court order. We satisfy that. We cited cases. The Luzak case in the district court said standing is different than loss causation, that the two are not equivalent. So we had standing. The court said, no, you didn't plead loss causation, and thereby you didn't establish standing. That in and of itself is an error. All right. Thank you, counsel. Thank you. I think we've got your case. We will be in recess until tomorrow.